# 6 NEWS

# Controversy of the week

## The gerontocracy: Why do octogenarians run Washington?

*ONSET MUTISM* (handwritten)

Senate Minority Leader Mitch McConnell was fielding questions from reporters at a typical Washington press conference last week when the 81-year-old froze mid-sentence. For 20 awkward and alarming seconds, McConnell stared glassy-eyed into the middle distance, clearly unable to speak. Fellow Republicans exchanged panicked looks as Sen. Joni Ernst (R-Iowa) crossed herself before a colleague led McConnell away by his arm. Though McConnell seemed to recover later in the day, his episode has revived "uncomfortable questions about the age and frailty of lawmakers in Washington," said **Lauren Fedor** in the *Financial Times*. McConnell, a survivor of childhood polio, reportedly has fallen multiple times and suffered a concussion and broken ribs in a fall in March. Aides push Sen. Dianne Feinstein (D-Calif.) around the Capitol in a wheelchair and shield her from the press; she appears to be "strikingly frail" and to be struggling with cognitive problems. Witnessing our gerontocracy's senior moments, said **Charlie Sykes** in *The Bulwark*, one can't help but think about President Biden, who, at 80, walks with arthritic stiffness, has tripped multiple times, and sometimes makes odd comments that leave even his aides scratching their heads. Imagine if the commander in chief had an episode like McConnell's. "Our politics would be upended in the blink of an eye."

"It feels like American politics has suddenly gone from 'ruling class' to 'drooling class,'" said **Matt Lewis** in *The Daily Beast*. The average senator is 65 years old, making this the oldest Senate in history. At 89, Republican Charles Grassley of Iowa was recently re-elected to a six-year term. Former President Trump loves to mock Biden's age, but he's not far behind at 77. Yes, "the marvels of modernity



*McConnell: Suddenly unable to speak*

*ACUTE ONSET MUTISM* (handwritten, vertical)

have allowed more of us to work productively into an advanced age." But after 75 and especially after 80, a decline is inevitable. "Mother Nature always wins. Always." Perhaps "we need age limits for political seats," said **Kirsten Fleming** in the *New York Post*. If your grandma were as "confused and frail" as these ancient officials often seem to be, "you'd take away her keys and sell her Buick to the teenage neighbor."

Blame the voters for re-electing the same senior citizens over and over, said **Zachary B. Wolf** in *CNN.com*. McConnell's office says he will serve as GOP leader through his term, which ends in 2027—if he seeks another term, does anyone think dark-red Kentucky wouldn't re-elect him? After all, "the most powerful force in American politics" is incumbency. In the 2022 midterms, every incumbent senator on the ballot won. Millennials complain about Baby Boomers clinging to power, but in recent presidential primaries, young progressives cast their votes for Bernie Sanders (now 81) and Elizabeth Warren (74). "Millennials are America's largest generation by population, but they're one of the smallest groups that make up Congress."

Blame also the politicians who suffer from "Potomac Fever," said **Kathleen Parker** in *The Washington Post*. In Washington, it's easy to become addicted to the intoxicating thrill of power, privilege, and "relevance"; after a decade or two or three, people convince themselves they're "indispensable" and can't imagine returning to life as a private citizen. By refusing to leave the stage in a rapidly changing world, octogenarian politicians "are depriving the country of fresh insights and representation," and they need to get out of the way. "There's no shame in recognizing when one's job is done."

## Only in America

■ A Black man who was elected mayor of an Alabama town is suing white council members who reappointed a white mayor without an election. Patrick Braxton, 57, was the only candidate who legally filed to run for mayor in Newbern, but the previous council locked him out of Town Hall and reappointed themselves. Council members say "they were acting under the color of law."

■ A white police officer is suing St. Louis officials for racial discrimination after he was not promoted to police chief, even though the winning candidate is also white. Michael Sack alleges that "race was a determining factor" in his being denied the job, and that city officials chose an outside white candidate only when several Black candidates turned them down.

## Good week for:

**Inclusion,** after President Biden publicly acknowledged for the first time that he has seven grandchildren, including Hunter's out-of-wedlock daughter, Navy, 4. "Jill and I only want what's best for all of our grandchildren, including Navy," said Biden.

**Swifties,** who did so much singing, dancing, and jumping up and down at a Taylor Swift "Eras" concert in Seattle that they caused seismologists to register a 2.3 "swiftquake."

**Downtime,** after the Hollywood actors' strike reportedly has led to a boomlet in plastic surgery. Since the strike may last months, said Beverly Hills plastic surgeon Ben Talei, many "A-list and B-list" actors "are running in to do it."

## Bad week for:

**Marking the spot,** after San Francisco authorities forced Elon Musk to remove a new "X" sign from the former Twitter building, because neighboring residents complained the flashing strobe lights were so bright that they lit up their apartments.

**Resets,** after GOP presidential candidate Ron DeSantis offered to have a beer with New Hampshire primary voters for $50, then cut the price to $1—and only 30 people showed up. DeSantis insisted "we're making big, big progress" in connecting with voters.

**Typos,** after police officers in Texas pulled over and pointed guns at an Arkansas family—including a 6-year-old—driving to a youth basketball tournament. One cop had typed "AZ" instead of "AR" into a license plate search and concluded their car was stolen. "It looks like we made a mistake," an officer told the weeping family.

## In other news

**Signs of summer Covid wave as hospitalizations rise**

The U.S. appears to be experiencing a summer Covid spike, with the Centers for Disease Control reporting that weekly hospitalizations have climbed 12 percent to 8,035. Cases appear to be climbing fastest in the Southeast, where searing heat has led many people to shelter in air-conditioned spaces, and slowest in the Midwest. "After roughly six, seven months of steady declines, things are starting to tick back up again," said CDC Covid incident manager Dr. Brendan Jackson. Older people account for most hospitalizations, but deaths have continued to fall, hitting their lowest levels on record. The FDA is expected to approve an updated vaccine in September to boost immunity and curb a potential winter Covid wave.

# ...and how they were covered

# House probes Biden's calls with Hunter

## What happened

A former business partner of Hunter Biden testified to Congress this week that President Biden spoke to his son Hunter's foreign business associates at least 20 times over a decade-long period—but said that Biden was not party to Hunter's financial dealings. Devon Archer, who served with Hunter on the board of Ukrainian energy firm Burisma Holdings in the 2010s, told a closed-door House Oversight Committee hearing that then–Vice President Biden was sometimes put on speakerphone during client meetings to help Hunter sell what he called "the brand." The phone calls were made during a range of events, including a dinner in Paris with a French energy executive and another in China with a private equity CEO. Archer said father and son engaged in casual conversations, about topics such as the weather, and "never once spoke about any business dealings."



*Archer: Hunter sold 'illusion' of influence.*

Republicans have spent months investigating Biden's ties to his son's globe-trotting consulting venture as part of a potential impeachment inquiry. House Oversight Committee co-chair James Comer (R-Ky.) said Archer's testimony proved that Biden had "lied to the American people when he said he had no knowledge about his son's business dealings and was not involved." Comer said Archer testified that Burisma executives put "constant pressure" on Hunter to "call D.C." when the company was being investigated for corruption by Ukrainian prosecutor Viktor Shokin. But Rep. Dan Goldman (D-N.Y.) said Archer testified that Burisma's board was unhappy when Shokin was fired in 2016—something then–Vice President Biden and other Obama officials had requested, believing Shokin was corrupt—because the company thought the prosecutor was "under its control." The House investigation, Goldman said, "is a complete waste of time."

## What the columnists said

"Everyone knows Hunter Biden wasn't selling his expertise in energy markets" when he sought big paydays from foreign firms, said *The Wall Street Journal* in an editorial. He was selling "the Biden family name and the political access it implied." Archer's testimony has already punched holes in two of President Biden's questionable claims: that he "never discussed" business with his son and that Hunter never made money from China. It seems "highly unlikely" that those father-son phone calls were only about the weather. "We'll see what else we learn as the House keeps looking."

This supposedly "bombshell hearing" failed to detonate, said **Philip Bump** in *The Washington Post*. As Archer made clear, Hunter promoted the "illusion" of influence over his father—there's "no evidence he ever tried to get Biden to do anything." Comer strained to link Biden's December 2015 speech in Ukraine calling for Shokin's ouster to Burisma's pressuring of Hunter to "call D.C." days beforehand. But Biden's Kyiv trip had already been scheduled by then and, Archer testified, "call D.C." could well have referred to Burisma's Washington-based lobbyists, not the vice president.

But the "wall of separation" between Hunter and Joe is "looking rather less robust than originally advertised," said **W. James Antle III** in the *Washington Examiner*. The White House has gone from claiming that the Bidens never talked shop "to them never being business partners." This is all happening just days after Hunter Biden's favorable plea deal for tax and gun crimes came apart. With so many "questions swirling around the Biden family," Donald Trump has the perfect opportunity to redirect attention from his own legal woes.

Republicans "would be wise to take a step back," said **Douglas E. Schoen** in *The Hill*. There's still no "smoking gun" implicating Biden, and a June poll found that even most Republicans don't consider investigating Hunter a top congressional priority. Far-right House members are pushing Speaker Kevin McCarthy (R-Calif.) to launch an impeachment probe, but without proof of Joe's involvement, voters would perceive that "as an overreach."

Even if the president didn't participate in Hunter's schemes, he surely "enabled them," said **Joe Klein** in *The Washington Post*. He let Hunter ride along on Air Force Two for a 2013 business trip to China. He had the White House devise a system so Hunter could sell his schlocky paintings to secret buyers in 2021 for a cumulative $1.3 million. Maybe compassion for his troubled, drug-addicted son clouded the president's judgment. Most families can deal with such matters in private, but not when the family name is Biden. Hunter "has gone from being an embarrassment to a real problem for his father."

## It wasn't all bad

■ The pilot and two passengers managed to walk away from a plane crash in Georgetown, Texas, last week with only minor injuries. The small aircraft flew down into a two-story house after its engine failed. After the crash, neighbors rushed to the house—which was not occupied—to help the pilot and passengers escape the wreckage in case there was an explosion. That all three survived with no lasting injuries "is a complete miracle," said Monica Steanson, the mother of Lauren Peralez, one of the passengers. "Words cannot explain."

■ Torbjørn "Thor" Pedersen, a 44-year-old Dane, last week returned to his homeland after a tour in which he covered 203 countries over 3,512 days without taking an airplane. Pedersen's decade-long quest to see every country in the world finished in the Maldives, which he reached on a container ship. Along the way, Pedersen got stranded in Hong Kong by Covid—and proposed to his girlfriend at the top of Mount Kenya (they married in 2021). He stuck to a daily budget of $20, thanks to crowdfunding and corporate support. Pedersen was welcomed home by 150 family members and fans. "There's a historical sense of returning home by ship," Pedersen said, "people can see it on the horizon."



*Pedersen's homecoming*

■ When Emily Dickerson, a 17-year-old student at Lewis Central High School in Iowa, lost a ring that held her father's ashes, she thought it was gone for good. She was on a school choir trip to McGee Beach in Corpus Christi, Texas, when the group went swimming. Emily stashed the cremation ring, and three others, in a takeout container box as she swam—then forgot the box. Corpus Christi city workers led by Laura Perez sorted through four tons of trash in the beach dumpster until they found the ring. "It was in the last bag we went through," Perez said. "I was so excited to let her know."

Getty, Thor Pedersen/Instagram

THE WEEK August 11, 2023

Diminished Capacity

"Yeah, I guess. Doc said it looks like someone broke her eye sockets at some point."

"Sounds like we're dealing with some domestic violence in her history, then. What did the doctor say about her amnesia?"

"He said it's a dissociative fugue state."

"You mean she experienced something traumatic and lost her memory?" Josie asked, thinking of Gretchen's words from the night before.

She heard Noah sigh. "Basically. I talked to the doctor over the phone at length. From what he said, it fits. People in fugue states usually appear quite normal; they just can't remember their past or their identity."

"Oh, is that all?" Josie snapped. "Luke is missing, and this woman may have valuable information. Either she is purposely withholding it, or whatever she saw put her into this . . . fugue state. Have you printed her?"

"It was the first thing we did," Noah said. "The state police got the results back to us almost immediately. She doesn't come up in AFIS."

AFIS was the Automated Fingerprint Identification System, a national database available to law enforcement that allowed them to match fingerprints found at crime scenes with anyone whose prints were in the system.

"Did the neurologist say how to snap her out of it?"

"There's not really any way to bring her out of it. He recommended having her seen by a psychologist or a hypnotist if we're really in a hurry."

"Jesus," Josie said. "We don't have time for this. What about Misty?"

"She's still unconscious. Brain swelling. The doctors are going to operate on her today to try to relieve the pressure. We'll have to wait till after that to question her."

"Keep checking on her progress," Josie said. "I'm coming in.

Exhibit 12

TRULINCS  94655379 - AIGBEKAEN, RAYMOND IDEMUDI - Unit: ENG-W-L

---------------------------------------------------------------------------------

FROM: Cisse, Kadiatou
TO: 94655379
SUBJECT: CHAT
DATE: 08/09/2023 04:21:03 PM

Yes, acute onset mutism can be debilitating. Acute onset mutism refers to a sudden and temporary loss of the ability to speak or communicate verbally. This can significantly impact a person's daily functioning and ability to interact with others, causing frustration and isolation. However, with proper diagnosis and treatment, many individuals with acute onset mutism can recover and regain their ability to speak.

*[handwritten annotations:]*

DEBILITATING

COGNITIVE / FUNCTIONAL

IMPAIRMENT

The psychologists at BOP assessed Aigbekaen at "ELEVATED) RISK OF SEXUAL VICTIMIZATION

I want to take a shower everyday but I am not allowed. Instead they handcuff me with my hand behind my back 2 or 3 days a week and throw me in the shower. Due to my inability to provide self care, Mr. Bozek wrote me an incident report to justify the BOP and the Warden's use of the SHU as a punishment for mental and medical incapacitation, instead of providing the appropriate treatment. For 6 years I've been begging for a sleep apnea machine, none has been provided. The Department of Veterans' Affairs sleep expert diagnosed me with sleep apnea prior to my incarceration, they also provided a sleep apnea machine but the BOP has ignored all of that. The experts at the VA also sent letters to me, seeking my presence at LHI health for a consult with a neurologist because of my debilitating migraine but the BOP has also disregarded that request while failing to provide appropriate care themselves.

As sanctions and additional punishments for suffering combat related PTSD and other ailments, the UDC held by Mr. Bozek and Mr. Canarrozzi suspended my Trulinc transactions for 6 months and Commissary for 3 months. I am not allowed to communicate with my family, attorneys or any advocacy group. I am also being denied access to the Courts.

The institution here at FCI Danbury puts inmates in conditions that leaves them no choice but to drink the toilet water from the same bowl within which they defecate. I am no longer allowed to go to commissary due to sanctions from the UDC if I am not provided cleaning supplies to clean the toilet bowl and the cell. The intolerably cruel and unusual punishment puts me outside of the ordinary incidents of prison life and creates extreme hardship. The conditions of confinement are in contravention of the laws, statues and Codes of the United States of America. I also asserverate that my immurement is inconsistent the Supreme Court's ruling in Farmer v. Brennan, 511 U.S 825, 832 , 84 CT and Estelle v. Gamble 429 U.S. 97 103-05 97 S.Ct 288 L.Ed

76

MEDICAL TREATMENT NOT PROVIDED

BP-A148.055
SEP 98

**INMATE REQUEST TO STAFF** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) Dr. Schindller | DATE: 02-14-2021 |
|---|---|
| FROM: Raymond Aigbekaen | REGISTER NO.: 94655-379 |
| WORK ASSIGNMENT: N/A | UNIT: S-H-U |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

I write to request compassionate release under Program statement
5050.50 due to my debilitating mental and Medical condition. I am bedridden
for more than 12 hours (50%) each day due to the Potency of my medication.
I am not allowed to exercise here at FCI Danbury. Due to the COVID-19
lockdown, I am also not allowed to go to class or to the library in education.
I had an episode of DEREALIZATION (Acute onset mutism) in January and
Seeing that I was unable to provide SELF-CARE, the officers handcuffed
Me and threw me in the hole (SHU) exposing me to the possibility of
Physical, verbal and Sexual assault. (Continued on next page)

(Do not write below this line)

DISPOSITION:

As stated you must exhaust the admin remedy process.
unless applying under a different criteria

Thank you,
R. Adamson

| Signature Staff Member | Date 2/16/21 |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          **SECTION 6**

Administrative Remedy Informal Resolution Form - Response
FCI Loretto, Pennsylvania
AIEGBEKAEN, Raymond
Reg. No.: 94655-379
June 2, 2022


The following is in response to your *Administrative Remedy Informal Resolution*, dated April 17, 2022.  In this *Administrative Remedy Informal Resolution*, you claim you are not receiving needed medical care and prescription medications.  Specifically, you claim you are not receiving needed care for Anemia, your knees, and breathing problems. In remedy, you request appropriate treatment.

In response, in an attempt to informally resolve your complaint, your Bureau Electronic Medical Record (BEMR), was reviewed and your concerns were discussed with your medical providers.  You transferred to FCI Loretto on March 25, 2022.  you were evaluated by the Clinical Director (CD) on April 4, 2022, and all of your medical problems/concerns were addressed and you were prescribed the appropriate medications for your medical conditions.  If you feel you require further prescriptions or medical treatment you may follow up with your Primary Care Provider (PCP).

I trust that this addresses your concerns.

Norman Weidlich
Health Services Administrator

LOR 1330.18B
10/22/2020
Administrative Remedy
Procedures for Inmates
Page 8

Attachment 2

### ADMINISTRATIVE REMEDY INFORMAL RESOLUTION FORM

Before an inmate may receive and file a Request for Administrative Remedy Form [BP-229(13)], he **must** ordinarily attempt to informally resolve his complaint with his Unit's Correctional Counselor.  Briefly state the inmate's complaint below and the informal resolution offered.

Date Form Issued by Unit Staff: *5-14-22*    Staff Initials: *JW*

Inmate Name: *Highbaugh Raymond*   Reg. No.: *94655-379* Unit: *E-N* Team: *D*

1.   Complaint and Relief Requested: *I am not receiving various prescribed medical treatments including for my anemia and my knees and my breathing problems*

Date inmate returned form to staff: *5-17-22*   Staff Initials: *O*

2.   Staff Response (Include effort to resolve):
*recvd 5/23/22 - NW*
N. Weiglich, HSA
Health Services Administrator

*see attach.*

Review Prior to Issuance of BP-9 _____  Date: _____
                                 Department Head

                              _____  Date: _____
                                  Unit Manager

Date response was explained: _____ Counselor's Initials: _____

Response was accepted/rejected. (Circle one)

Inmate Initials: _____  Date: _____

Date BP-229(13) Issued: ____ Staff Initials: ____ Inmate Initials: ___

DISTRIBUTION:  If complaint is informally resolved - Forward to Administrative Remedy Clerk.  If the complaint is **NOT** informally resolved - Forward to Administrative Remedy Clerk, along with the completed BP-229(13) Form.

*CAP STILL NO BEING PROVIDED AS OF August 2023*

*FCI LORETTO*

SENTENCING EXHIBIT

120

Exhibit E

```
1              THE COURT:  That would be unusual.
2              MR. BALTER:  If we get to that point, what it says
3     is you can -- you can look at these facts in any conceivable
4     way and come up with a rationale for the conclusion that the
5     person is vulnerable.  Any set of facts, any conceivable set
6     of facts will show you that a child like this is vulnerable.
7     I think cutting through that --
8              THE COURT:  It's not vulnerable it's unusually
9     vulnerable.
10             MR. BALTER:  And I -- again, I just -- I don't see
11    anything which truly distinguishes, unfortunately, this case
12    from so many other cases.  And the way the expert testified,
13    this was exactly the type of profile.  The kids were running
14    away at this young age unfortunately are the kids who have had
15    so many problems in their life for so many different reasons.
16    You could say L.'s problem arose at three months and somebody
17    else's arose at six months.  I don't mean to diminish it, but
18    that's basically what we're going down to.
19             THE COURT:  Do you agree that the guideline is not
20    concerned with what your client knew in this context?
21             MR. BALTER:  When you say "knew," I mean, what's
22    presented -- what is -- you know, I don't think -- obviously,
23    he didn't know what had happened, you know, when she was three
24    months old.
25             THE COURT:  Right.
```

Guideline Commentary
"knew" or "should have known"

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

\*

UNITED STATES OF AMERICA                         \*

    v.                                                           \*                    CRIM. NO.  JKB-15-0462

RAYMOND AIGBEKAEN,                             \*

    Defendant.                                               \*

    \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*

## MEMORANDUM AND ORDER

Raymond Aigbekaen has moved the Court to reduce his sentence pursuant to 18 U.S.C. §
3582(c)(2).  (ECF No. 592.)  That statute empowers courts to "modify a term of imprisonment"
where a defendant was sentenced "based on a sentencing range that has subsequently been lowered
by the Sentencing Commission . . . after considering the factors set forth in [18 U.S.C. § 3553(a).]"
Aigbekaen was sentenced to 180 months' incarceration and 5 years' supervised release for his
convictions related to sex trafficking.  (See Judgment, ECF No. 228.)  In its Presentence Report,
the United States Probation Office assigned Aigbekaen a guidelines range with a floor of 188
months in prison based on a total offense level of 36 and a criminal history category of I.  (See
Am. Presentence R. & R., ECF No. 226, ¶ 94.)  Aigbekaen claims that this guidelines calculation
relied on "inapplicable enhancements" which the Court "should have detected at sentencing," and
that his true offense level should have been either 30 or 32, which would have yielded a range of
either 97 to 121 months or 121 to 151 months, respectively.  (ECF No. 592.)

Aigbekaen's Motion fails to explain which sentencing enhancements were wrongly applied
and why they did not apply.  (See generally id.)  As such, the Court cannot determine whether his
guidelines range would in fact be different were he sentenced today.  Further, it is unclear whether

1

1           MR. BALTER:  I mean, to a certain extent, yes.  I

2     mean, the way these guidelines are often put together, you

3     know, there is no clear distinction between what a defendant

4     is charged with knowing and what's not is ambiguous to that

5     extent, but I think clearly this fits within that -- you know,

6     the area that is part of the general profile, the generic

7     profile, and it shouldn't apply.

8           I would also point out that the government

9     negotiated a plea with Greene that didn't add this vulnerable

10    victim adjustment.  He was apparently given that benefit.  And

11    while, you know, I understand that in cooperation agreements

12    this often is the case, I just -- I think in terms of

13    proportionality analysis --

14          THE COURT:  That's a 3553(a) proportion -- relative

15    penalties argument.

16          MR. BALTER:  Thank you.

17          THE COURT:  I find that it applies.  And I am

18    content to do it based on the testimony that I now clearly

19    recall about the unusually deprived circumstances of the

20    victim, early childhood.  And the natural sequelae from that,

21    natural consequences of having been neglected in that regard.

22    I think that that did make her unusually vulnerable.

23          Okay.  We finished paragraph 34.  I promised the

24    reporter a break and we're going to take it.  So we're in

25    recess for 30 minutes until 2:45.  And I will see counsel in

Aigbekaen's argument is that his guidelines range has "subsequently been lowered" such that §

3582(c)(2) applies, since he contends that the Court "should have detected" the alleged error at

sentencing. (*Id.*) Finally, even assuming that Aigbekaen's contention had merit, the Court would

not grant a sentencing reduction because Aigbekaen has not provided the Court with any

information that would alter its original assessment of the § 3553(a) factors in his case, which led

it to impose a sentence of 180 months. (*See* ECF No. 427 at 4 (describing and reaffirming the

Court's original § 3553(a) analysis); ECF No. 447 (same); ECF No. 497 (same).)

For these reasons, it is hereby ORDERED that Aigbekaen's Motion for Sentence

Modification (ECF No. 592) is DENIED.


Dated this ___5___ day of August, 2023.

BY THE COURT:

James K. Bredar
Chief Judge

2

03-07-23;12:07PM;

Aigbekaen, Raymond I
CSN: 190102267
MRN: 59338872   Male
DOB: 11/04/1986   Adm: 3/7/2023

**Bureau of Prisons**
**Health Services**
**Consultation Request**

HFG

| | |
|---|---|
| Inmate Name: AIGBEKAEN, RAYMOND IDEMUDIA | Reg #: 94655-379   Complex: GRE |
| Date of Birth:   11/04/1986 | Sex:   M |

Report of Consultation: Gastroenterology     Subtype: Colonoscopy

Inmate Name: AIGBEKAEN, RAYMOND IDEMUDIA          Reg #:   94655-379
Date of Birth: 11/04/1986                         Sex:    M
Institution:   GREENVILLE FCI
               100 U.S. HWY 40
               GREENVILLE, Illinois 62246
               6186646200

Assessment:

3-7-23

Negative Colonoscopy

Recommend   EGD

EGD never scheduled [...] Colat he feel

Plan:

Peter S. Keim MD

Signature
Date

unable to self care within a prison environment

Completed By:

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff. While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilization review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

M. Mills-
Registered Nurse
FCI/FPC Greenville

Returned on 3/7/23 @ 1205 P-Kellerd M. Mim

P. Keller, Nurse
Registered Nurse
FCI/FPC Greenville, IL

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: AIGBEKAEN, RAYMOND IDEMUDIA | | Reg #: 94655-379 |
| Date of Birth: 11/04/1986 | Sex: M   Race: BLACK | Facility: DAN |
| Encounter Date: 01/12/2021 11:58 | Provider: Escobar, Werner FNP | Unit: G03 |

Mid Level Provider - Evaluation encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT  **1**          Provider:  Escobar, Werner FNP

Chief Complaint:   Other Problem

Subjective:     Patient with lab results Normocytic anemia. RBC 4.29 I will order Ferritin and iron studies and
in the interim order Ferrous Gluconate.

**Pain:**        No

COMPLAINT  **2**          Provider:  Escobar, Werner FNP

Chief Complaint:   ORTHOPEDIC/RHEUMATOLOGY

Subjective:     Patient with complain of upper back and right shoulder pain. He states he has experienced
pain x 3-5 years and has been diagnosed wit scoliosis 7 years ago.

**Pain:**        Yes

**Pain Assessment**

| | |
|---|---|
| Date: | 01/12/2021 12:02 |
| Location: | Multiple Locations |
| Quality of Pain: | Aching |
| Pain Scale: | 6 |
| Intervention: | assessment |
| Trauma Date/Year: | |
| Injury: | |
| Mechanism: | |
| Onset: | 1-5 Years |
| Duration: | 1-5 Years |
| Exacerbating Factors: | Raising right arm, pulling |
| Relieving Factors: | rest, medication |
| Reason Not Done: | |
| Comments: | Thoracic spine, Right shoulder, right scapula |

*Iron Studies Never Conducted* (handwritten)

**ROS:**

**General**

**Constitutional Symptoms**

No: Chills, Easily Tired, Fever

**Integumentary**

**Hair**

Yes: Within Normal Limits

**Nails**

Yes: Within Normal Limits

**Skin**

Yes: Within Normal Limits

**HEENT**

**Ears**

124

```
1   have to argue that.  I really am focused on one question.  Why

2   isn't your guy the supervisor of L.?  She's a sex worker,

3   that's illegal.

4          MR. BALTER:  I submit that under these

5   circumstances, in this case, the analysis should be that she

6   is a victim, that the conspiracy would be Greene and Aigbekaen

7   and Aigbekaen was a subordinate to Greene.
```
*Longer Sentence for least culpable defendant*

```
8          THE COURT:  "If the defendant was an organizer,

9   leader, manager, or supervisor in any criminal activity, other

10  than described in A and B, increase by two levels."  He

11  supervised L.

12         MR. BALTER:  It doesn't say there specifically that

13  the victim is to be counted as a supervisee.

14         THE COURT:  Well, does it say that she's not, and

15  who says that somebody can't be both a victim and at the same

16  time a participant in criminal activity?
```
*Sentencing Commission & 10th Circuit*

```
17         MR. BALTER:  I submit that the rule of lenity says

18  that that is not the way to analyze it.

19         THE COURT:  Have you got any cases?

20         MR. BALTER:  No.
```
*US V. JARRETT 10th Cir.*

```
21         THE COURT:  No, well, that's the end of that.

22  That's two levels.  He was a supervisor, at least of L.

23         MR. BALTER:  And I also, again, just reserve -- on

24  the question of proportionality just reserve the issue with

25  regard to Greene not having the adjustment.
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

```
 1              THE COURT:  Well, yeah, but that's a recommendation

 2      from the government, that's nothing the Court's done.

 3              MR. BALTER:  Well, that's true --

 4              THE COURT:  And there's no (C) plea.  I'm making my

 5      own independent sentencing decision with respect to

 6      Mr. Greene, I can assure you.

 7              MR. BALTER:  Well, I understand the Court makes a

 8      decision with regard to that.  To the extent that, as is not

 9      unusual, cooperating witness gets the benefit of whatever was

10      negotiated before he undertook his -- before he performed

11      pursuant to the terms of the cooperation, it is not unusual

12      that they get the benefit of what's ever been negotiated.

13              THE COURT:  Yeah, well, I don't take (C) pleas as

14      you know, and nothing is confirmed in here in that regard and

15      subject to Mr. Trainer's advocacy, which I'm sure will be

16      superb.  To me this thing looks like Greene and Aigbekaen are

17      all relatively equal participants in this deal.  And then, you

18      know, Greene will get the benefit of acceptance and Greene

19      will get the benefit of cooperation.  But that's for another

20      day.  We're not there yet and I'm not prejudging any of that.

21      No adjustment for obstruction.  So what's the adjusted offense

22      level, 36?

23              MS. DE ESTRADA:  Your Honor, if you are

24      incorporating the grouping rules, you add one point level to

25      the 36, you're at a 37 with an advisory guideline range of 210
```

Health Services
FCI/ FPC Greenville
100 US Rt 40
Greenville, IL 62246

*Exhibit J*

# AFTER VISIT SUMMARY

**Raymond I. Aigbekaen** MRN: 59338872
🔲 Iron deficiency anemia  📅 3/7/2023  📍 HSHS Holy Family Hospital Surgical Services

# 94655 · 379   DOB: 11/4/1986

*HIGH BLOOD PRESSURE*

## Instructions

🔲 **Talk with your provider about your medications**

❓ ASK how to take:
ALBUTEROL IN

amLODIPine 5 MG tablet (NORVASC)

FLUoxetine 20 MG capsule (PROzac)

hydroCHLOROthiazide 25 MG tablet (HYDRODIURIL)

risperiDONE 0.5 MG tablet (RisperDAL)

Review your updated medication list below.

## Your Next Steps

━━━ 📖 **Read** ━━━

🔲 Read these attachments
• Moderate Sedation in Adults Discharge Instructions (English)
• Colonoscopy Discharge Instructions (English)

## Your Latest Vitals

*OBESITY*

 Blood Pressure **130/97**

 BMI **34.17**

 Weight **245 lb**

 Height **5' 11"**

 Temperature (Temporal) **98.6 °F**

❤️ Pulse **95**

Respiration **16**

Oxygen Saturation **100%**

BSA **2.36 m²**

## What's Next

**Follow up with Dr. Peter S Kim, MD**

HSHS MEDICAL GROUP
3 St Elizabeth's Blvd
Ste 5000
O FALLON IL 62269
618-641-5803

## MyChart

**Thank you for choosing  us for your healthcare needs!**

MyChart is the online tool that empowers you with secure access to your health care information and the ability to communicate with your doctor from any computer, 24 hours a day.

If you are not signed up, please go to https://www.mychartportal.org, click on the Sign Up Now button. Enter your social security number, date of birth and the following code:

9NN5R-M3TWT
Expires: 4/21/2023 11:26 AM

## Hospital Problems

| Problem | Codes | Priority | Class | Date Reviewed: 3/7/2023 Noted |
|---|---|---|---|---|
| * (Principal) Iron deficiency anemia | ICD-10-CM: D50.9 ICD-9-CM: 280.9 | | | 2/17/2023 |

| Inmate Name: | AIGBEKAEN, RAYMOND IDEMUDIA | | Reg #: | 94655-379 |
|---|---|---|---|---|
| Date of Birth: | 11/04/1986 | Sex: M Race: BLACK | Facility: | DAN |
| Encounter Date: | 01/12/2021 11:58 | Provider: Escobar, Werner FNP | Unit: | G03 |

No: Normal Exam R, Full Range of Motion R, Non-Tender on Palpation R, Normal Active ROM R

**Shoulder ROM and Tests**

Yes: Forward Flexion R, Forward Extension R

**Spine-Thoracic**

Yes: Tenderness, Decreased Range of Active Motion

No: Normal Exam R, Full Range of Motion

**Thoracic Spine ROM and Tests**

No: Increased Kyphosis

**Mental Health**

**Mood**

Yes: Appropriate

**Orientation**

Yes: Alert and Oriented x 3

**Recent Memory**

Yes: Within Normal Limits

_[handwritten: Commissary is limited to salty & fatty foods & unable to provide self care ... could be deleterious HEALTH SHU and MENTAL placement]_

**Exam Comments**

BMI 27.9% he has been educated to make dietary modifications and increase exercise to promote weight loss. Patient with anemia I will obtain ferritin studies, and Iron studies. I the interim I will order ferrous gluconate and follow up with patient in 6-8 weeks.

Patient with limited range of motion to right shoulder with flexion limited to 150 degrees and had pain with extension. Abduction limited to 150 degrees with pain and he was able to perform adduction. I will obtain Right shoulder X-ray 3 view to include scapula

Back Patient had limited active ROM he states he has scoliosis However I did not observed significant difference in shoulder height or curvature to spine. I will however obtain T-spine and L-spine x-rays. I have informed patient to purchase non-aspirin from commissary Acetaminophen and to take 3 tablets (975mg) every 8 hours as needed for pain.

**ASSESSMENT:**

Anemia, unspecified, D649 - Current

Impingement syndrome of shoulder, M7540 - Current

Low back pain, M545 - Remission

Scoliosis, unspecified, M419 - Current

Sickle-cell trait, D573 - Current

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | | Order Date |
|---|---|---|---|
| | Ferrous Gluconate Tablet | | 01/12/2021 11:58 |
| | **Prescriber Order:** | 1 tablet Orally - Two Times a Day x 90 day(s) -- take one tablet twice a day x 90 days | |
| | Indication: | Anemia, unspecified | |

**OTC REPORTED**

**New OTC:**

| Medication | OTC Source | Start Date | Stop Date |
|---|---|---|---|
| Acetaminophen 325 MG Tab | Commissary-Recommended | 01/12/2021 | |

**Bureau of Prisons**
**Health Services**
**Clinical Encounter**

| | | |
|---|---|---|
| Inmate Name: AIGBEKAEN, RAYMOND IDEMUDIA | | Reg #: 94655-379 |
| Date of Birth: 11/04/1986 | Sex: M   Race: BLACK | Facility: ENG |
| Encounter Date: 05/11/2023 13:06 | Provider: Conroy, S. (MAT) DO, CD | Unit: W03 |

Chronic Care - 14 Day Physician Eval encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT   **1**          Provider:   Conroy, S. (MAT) DO, CD

Chief Complaint:   GENERAL

Subjective:   36 y/o B M seen for 14-day.  Transferred from GRE for the VETS program.  Releases 2028.
The allergies have been reviewed with the patient for the presence or absence of allergies,
sensitivities, and other reactions to drugs and medications.

Anemia: mild.  no active bleeding.  etiology/source is unclear.  had a c-scope done MARCH
2023 and was normal.  the GI Dr. recommended IM have an EGD.  Has had Rx Ferrous
Gluconate that was not continued here at ENG for unclear reason.   → 3663 factor - provide
care in an "Effective" manner

Sickle Cell trait: IM is aware of this.  Had testing in APRIL 2022 to confirm Sickle Cell Train
with Hemoglobinopathy Eval.  S was elevated and A was decreased.

Pain:          Not Applicable

---

COMPLAINT  **2**          Provider:   Conroy, S. (MAT) DO, CD

Chief Complaint:   HYPERTENSION

Subjective:   HTN: started on BP medication around 2 years ago.  Has Rx Norvasc 10 mg daily and HCTZ
25 mg daily.  reports he is compliant with taking these medications.  Does eat a lot of
commissary foods likely full of salt.  BP=152/104 today.   Denies LE swelling.  Denies h/o
CAD/CVA/AMI.  Denies chest pain at rest or with exertion.  Walking now for exercise.
JULY 2022:
Cr=1.06

MAY 2022:         Inability to Provide SELF CARE
A1c=5.5

Pain:          Not Applicable

---

COMPLAINT  **3**          Provider:   Conroy, S. (MAT) DO, CD

Chief Complaint:   MENTAL HEALTH

Subjective:   Has Dx Anxiety in the chart but he says that he has PTSD: has Rx Fluoxetine 10 mg daily
and Risperidone 1.5 mg hs.  says he has been on these medications a few months. Used to
also be on Remron which did help him somewhat but at this time he does not want to go back
onto the Remeron even though he thought about going back for a few minutes.  He says he is
still having episodes that he does not remember but others tell him about that could be linked
to his MH issues.  IM is very soft spoken and does not talk a lot so is hard to be clear what he
is describing.
At this time I will renew the Fluoxetine and Risperidone and ask the Psychologists to set him
up with a TelePsych visit to help manage his medications.
Denies h/o self harm/suicide attempt and denies recent/current SI/HI.

Pain:          Not Applicable

---

COMPLAINT  **4**          Provider:   Conroy, S. (MAT) DO, CD

Chief Complaint:   PULMONARY/RESPIRATORY

Subjective:   Asthma: began around 12 yoa.  Has Rx Albuterol that he uses 2 puffs each morning.
Triggers:  cold weather or high exertion.  Breathing has been good and stable lately.  no new

*Exhibit M*

# Bureau of Prisons
## Health Services
### History & Physical

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | AIGBEKAEN, RAYMOND IDEMUDIA | | | Reg #: | 94655-379 |
| Date of Birth: | 11/04/1986 | Sex: M | Race: BLACK | Facility: | LVN |
| Encounter Date: | 10/25/2022 13:52 | Provider: | Armes, Shawn FNP-BC | Unit: | A12 |

**Seizures:**

   **Type:** Unknown

   **Frequency:** Unknown

   **Age of Onset:**

   **Last Seizure:** None for last 5 years or longer

   **Comments:**

**Diabetes:** Denied

**Cardiovascular:** Denied

**CVA:** Denied

**Hypertension:**

   **Age of Onset:**

   **Comments:**

Respiratory:

   Age of Onset:

   Hx of Asthma: Yes

   Hx of Emphysema: No

   Hx of COPD: No

   Comments:  -SLEEP APNEA.  DOES NOT HAVE A CPAP MACHINE
                -Last Asthma attack one month ago, uses albuterol fox exacerbations.

**Sickle Cell Anemia:**

   **Trait:** Yes

   **Disease:** No

   **Current Symptoms:** No

   **Last Crisis:** > 1 Year

   **Hospitalized Last Crisis:** Yes

   **Comments:** Last attack 8 years ago.

**Carcinoma/Lymphoma:** Denied

**Allergies:** Denied

*[handwritten annotations:]*
*BOP COVID - Guidelines Still in Effect*

*Numerous defendants granted compassionate release on this ground. See e.g. US v. Braccia*

*Exhibit N* (handwritten)

## Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | AIGBEKAEN, RAYMOND IDEMUDIA | | | Reg #: | 94655-379 |
| Date of Birth: | 11/04/1986 | Sex: | M      Race: BLACK | Facility: | LVN |
| Note Date: | 10/04/2022 15:55 | Provider: | Clark, Jason (MAT) MD | Unit: | A12 |

Admin Note - Orders encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**       Provider:  Clark, Jason (MAT) MD

Transferred to Leavenworth, previously put in for a consult.  Will reassess and reorder here if indicated

**Discontinued Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Neurology | 07/24/2022 | 07/24/2022 | Routine | No | |

Subtype:

Reason for Request:

Neurology: pt with complex history (see attached documentation) who carries diagnoses of PTSD, depression, and anxiety; pt is reporting frequent episodes of what seems best described as derealization; please consider EEG study to help rule out organic causes of possible derealization/depersonalization episodes; PLEASE send along my note of 6/22/22, all recent labs, and MRI study result.

| | | | | | |
|---|---|---|---|---|---|
| Radiology | 07/24/2022 | 07/24/2022 | Routine | No | |

Subtype:

Reason for Request:

MRI brain with and without contrast: pt with complex history who carries diagnoses of PTSD, depression, and anxiety; pt is reporting frequent episodes of what seems best described as derealization; MRI study is to help rule out organic causes of possible derealization/depersonalization episodes

**Copay Required:** No            **Cosign Required:**  No
**Telephone/Verbal Order:**  No

Completed by Clark, Jason (MAT) MD on 10/04/2022 15:56

*EEG still not conducted. None of the "consults" have been done* (handwritten)

Exhibit C

| Inmate Name: | | | | | |
|---|---|---|---|---|---|
| Date of Birth: | 11/04/1986 | | Sex: | M | Race: BLACK | Facility: LOR |
| Encounter Date: | 06/22/2022 14:24 | | Provider: Swindell, Kim MD/CD | | Unit: Z01 |

| Date | Time | | Rate Per Minute | Provider |
|---|---|---|---|---|
| 06/22/2022 | 14:24 LOR | | 14 | Swindell, Kim MD/CD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 06/22/2022 | 14:24 LOR | 105/102 | | | | Swindell, Kim MD/CD |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 06/22/2022 | 14:24 LOR | 214.0 | 97.1 | | Swindell, Kim MD/CD |

**Exam Comments**

GEN: NAD, non-toxic appearing
HEENT: PERRL, EOMI, MMM, O/P without lesion, neck supple, no LAD, thyroid normal size and consistency without nodularity; no bruit
Lungs: CTA B/L
Heart: RRR without murmur/rub/gallop
Abd: soft, NT/ND, NABS, no HSM
Ext: warm, WP, brisk cap refill
Skin: no lesions noted
Neuro: normal tone/power/reflexes/gait; cranial nerves intact to examination; normal speech; asks and answers questions appropriately; makes eye contact during conversation

**ASSESSMENT:**

Posttraumatic Stress Disorder, F43.10 - Current

**PLAN:**

**New Laboratory Requests:**

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests - Short List-General-TSH | One Time | 06/27/2022 00:00 | Routine |
| Lab Tests - Short List-General-T4, Free | | | |
| Lab Tests - Short List-General-Comprehensive Metabolic Profile (CMP) | | | |

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Neurology | 07/24/2022 | 07/24/2022 | Routine | No | |

Subtype:

Offsite Appt

Reason for Request:

Neurology: pt with complex history (see attached documentation) who carries diagnoses of PTSD, depression, and anxiety; pt is reporting frequent episodes of what seems best described as derealization; please consider EEG study to help rule out organic causes of possible derealization/depersonalization episodes; PLEASE send along my note of 6/22/22, all recent labs, and MRI study result.

| Radiology | 07/24/2022 | 07/24/2022 | Routine | No | |
|---|---|---|---|---|---|

Subtype:

MRI

Reason for Request:

MRI brain with and without contrast: pt with complex history who carries diagnoses of PTSD, depression, and anxiety; pt is reporting frequent episodes of what seems best described as derealization; MRI study is to help rule out organic causes of possible derealization/depersonalization episodes

ier:

erated 06/24/2022 10:07 by Swindell, Kim MD/CD          Bureau of Prisons - LOR

1            THE COURT:  That would be unusual.

2            MR. BALTER:  If we get to that point, what it says

3    is you can -- you can look at these facts in any conceivable

4    way and come up with a rationale for the conclusion that the

5    person is vulnerable.  Any set of facts, any conceivable set

6    of facts will show you that a child like this is vulnerable.

7    I think cutting through that --

8            THE COURT:  It's not vulnerable it's unusually

9    vulnerable.

10            MR. BALTER:  And I -- again, I just -- I don't see

11    anything which truly distinguishes, unfortunately, this case

12    from so many other cases.  And the way the expert testified,

13    this was exactly the type of profile.  The kids were running

14    away at this young age unfortunately are the kids who have had

15    so many problems in their life for so many different reasons.

16    You could say L.'s problem arose at three months and somebody

17    else's arose at six months.  I don't mean to diminish it, but

18    that's basically what we're going down to.

19            THE COURT:  Do you agree that the guideline is not

20    concerned with what your client knew in this context?

21            MR. BALTER:  When you say "knew," I mean, what's

22    presented -- what is -- you know, I don't think -- obviously,

23    he didn't know what had happened, you know, when she was three

24    months old.

25            THE COURT:  Right.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Courts are bound by the Commentaries and application notes that explain the Guidelines

119

Exhibit Q

```
 1    victims in the cases that our office handles have that kind of

 2    profile.  They're not unusually deprived of social interaction

 3    or unusually sheltered the way that this victim was.

 4              THE COURT:  Mr. Balter.

 5              MR. BALTER:  Your Honor, I don't know that we can go

 6    back to the post natal to justify --

 7              THE COURT:  I don't know, maybe we can.  I'm not

 8    dismissing that.

 9              MR. BALTER:  I mean, what the government expert

10    said, it gave the profile of a kid who's a runaway, who's, you

11    know, been deprived in every conceivable way, and those are

12    the kids who are susceptible to this.  I think the

13    government's argument quite frankly would have been much

14    stronger if they had had -- if L. had been a person who had

15    never, you know, may have runaway for the first time or

16    whatever, never been down this road before, and for those

17    reasons, you know, was really kind of exploited in that kind

18    of first time kind of way.  That's not what happened.  She had

19    just walked across the street for a better deal.  And it's a

20    tragic situation that --

21              THE COURT:  Maybe she was more vulnerable to your

22    client because she had a prior lifestyle and experience as a

23    child prostitute.

24              MR. BALTER:  Well, Your Honor, I suppose if we get

25    to that --
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1  everything there, that if he was helping in some way, that

2  would be aiding and abetting.

3          Aiding and abetting -- and listen to the instruction

4  by the Court -- requires a certain state of mind.  It requires

5  a state of mind equivalent to what would cause one to be liable

6  under the statute.  That state of mind has got to include the

7  knowledge or the reckless disregard of a fact.  It's called

8  mens rea, and it has to be of an equivalent nature.  And you --

9  I want you to listen to the Court on this.  The Court's

10 instructions ultimately rule on any of these legal matters.

11         But one way or another, I submit to you on aiding and

12 abetting, you have to reach the same question.

13         And with regard to the conspiracy charge, as well, if

14 it is a conspiracy to sex traffic, "sex traffic" includes those

15 elements.  And those elements do not apply to Raymond.  Raymond

16 did not intend to join any group, any enterprise, any criminal

17 activity which would have been involved with that.

18         Now, you're also going to hear an instruction that if

19 Raymond had a reasonable opportunity to observe L., that that's

20 enough, by itself, for him to be held responsible for knowing

21 L. was under the age of 18.

22         If a Child Protective worker testifies that looking at

23 L. herself, she looks to be over the age of 18; 19 or 20, that

24 is what becomes reasonable within this context.

25         It is not reasonable to think that a person such as

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

- *DEFENDANT'S CLOSING ARGUMENT* -

1    Raymond would be able to ascertain what her age was in a way

2    that makes him culpable. *See VA Ruling "impaired judgment"*

3              So, ladies and gentlemen, when you look closely at

4    these elements, the Government clearly cannot fulfill them

5    beyond a reasonable doubt.

6              Can you please go to Screen 9.

7              Screen 9 contains the equivalent element for

8    interstate transportation and to engage in prostitution.  And

9    you're going to see that -- those charges, it's similar to the

10   sex trafficking in that there is a substantive count and there

11   is a conspiracy count.

12             But when you look at what the definition is here, it's

13   similar, but it's different, because in this, while there has

14   to be -- you'll -- there has to be an intent, the intent is

15   only to engage in prostitution or illegal sexual activity.

16   There is no requirement for interstate transportation to engage

17   in prostitution that there be force, fraud, or coercion.  There

18   is no requirement that there be knowledge with -- or that there

19   be a minor involved.

20             And if you are looking for what an alternative basis

21   for liability is in this case that doesn't include the

22   sex trafficking, you may want to review what the elements are

23   for interstate transportation in aid of prostitution.

24             One final instruction that I believe you're going to

25   hear about which I think you should be taking into account --



**HINCKLEY ALLEN**

20 Church Street
Hartford, CT 06103

p: 860-725-6200  f: 860-278-3802
hinckleyallen.com

*David A. DeBassio*
*ddebassio@hinckleyallen.com*
Phone:  860-331-2768

<u>VIA FACSIMILE</u> – (203) 773-2334

July 21, 2023

The Honorable Judge Jeffrey Meyer
United States District Court, District of Connecticut
141 Church Street
New Haven, CT 06510

      RE:    <u>Aigbekaen v. Warden et al</u>, Docket No. 3:21-cv-01526 (JAM)
               Pro Bono Appointment

Dear Judge Meyer:

On July 10, 2023 I was appointed as Pro Bono counsel for the plaintiff, Raymond Aigbekaen, in the above referenced case. (Docket Entry No. 26)  The appointment was for the limited purpose of assisting the Plaintiff with locating and serving Defendants Durant and Lewis.  The task was to be completed within 14 days of the appointment, namely by July 24, 2023.

Please be advised that after a lengthy and diligent search within the time provided by the Order, my staff and I cannot locate the named Defendants with any certainty.  Through our research we believe the Defendants' names are Timothy Durant and Kenneth Lewis, respectively.  We searched online for other cases that might have named these individuals as parties in litigation and we did a nationwide search, focusing on Connecticut and Florida given the location of the alleged incidents in the Complaint and the information provided to your clerks by the United States Bureau of Prisons ("USBOP"). (See Complaint, Docket Entry No. 1 and Order, Docket Entry No. 20)  Unfortunately we could not positively confirm the location of the two named Defendants; the names were too common in our research to narrow the search down to two specific individuals we were certain were the named Defendants.

ALBANY    BOSTON    CHICAGO    HARTFORD    MANCHESTER    NEW YORK    PROVIDENCE

*[handwritten in left margin:]* UNDUE DELAY IN CIVIL CASE

*[handwritten at top:]* Exhibit U

*[handwritten in right margin:]* VICTIM OF SEXUAL ABUSE BY STAFF VM KENNETH LEWIS

Page 2

Further, when the USBOP failed to provide the Clerk with any forwarding address or contact information for the two Defendants, stating to the clerk the two Defendants "may have either relocated to Miami or retired" (See Order No. 20) we researched and determined that the names and addresses of the Defendants were not subject to the Freedom of Information Act and therefore a request to the USBOP would not provide us with the necessary information.

We are happy to accept any guidance or direction from the Court, however without further personal information we could use to identify the individuals I am uncertain what steps could be taken to positively identify the Defendants. I would therefore respectfully ask for Relief from the Order appointing me as Pro Bono counsel for the limited purpose of assisting the Defendant with locating and serving the Defendants Durant and Lewis.

Sincerely,

David A. DeBassio

DAD:jem

cc:    Raymond Aigbekaen
       #94655-379
       FCI Danbury
       33 1/2 Pembroke Rd.
       Danbury, CT  06811

       Raymond Aigbekaen
       #94655-379
       FCI Englewood
       9595 West Quincy Avenue
       Littleton, CO  80123

63965357

ALBANY    BOSTON    CHICAGO    HARTFORD    MANCHESTER    NEW YORK    PROVIDENCE

# Held and Beaten by the Memphis Police as He Cried, 'Mo

*From Page A1*

boarded up windows and cautioned their employees about potential disruptions downtown. Many in the city have also been girding themselves for viewing scenes they knew would be upsetting.

"Tonight will be one of the toughest nights that we will ever experience in the city," Van Turner Jr., the president of the Memphis branch of the N.A.A.C.P., said in a news conference on Friday morning, noting the sorrow that had already been coursing through Memphis in recent days.

The video reverberated beyond the city, as the case has tapped into an enduring frustration over Black men having fatal encounters with police officers. There were small protests in Washington, D.C., New York City and Sacramento, where Mr. Nichols had lived before Memphis. President Biden said in a statement that the video had left him "outraged and deeply pained."

It is another reminder, he said, "of the profound fear and trauma, the pain, and the exhaustion that Black and Brown Americans experience every single day."

DeVante Hill, an activist who was planning to hold a rally in Memphis on Saturday, expressed a level of exasperation. "I wish I could say I'm sick and caught off guard, but I'm not," he said, describing complaints against the Memphis Police Department stretching over generations. "I am not shocked as much as I am disgusted."

Still, he acknowledged the gravity of the case. "This is a defining moment," Mr. Hill said, "not just for Memphis, but for the entire

**'His last words on this earth were, "Mom, Mom, Mom." He's screaming for her.'**

BEN CRUMP, a civil rights lawyer representing the family.

pearance on Friday on a podcast produced by The Daily Memphian that the unit was now inactive.

But Mr. Strickland added that he was also focused on a more substantial examination of the culture within the Police Department, and how officers interact with the community. "We still need to examine if there's anything that we could do to prevent this from happening again," Mr. Strickland said on the podcast.

Mr. Nichols was stopped on the evening of Jan. 7 in the southeastern corner of the city. Officers forced him out of his car and wrestled him to the ground, according to the videos. He dropped to the ground and laid on his side, imploring the officers to stop and saying, "I'm just trying to get home," as they held down different parts of his body.

Though he appeared to show no resistance, the police threatened to hurt him further and continued to order him to get on the ground, apparently wanting him to roll onto his stomach. About two minutes into the encounter, an officer directed pepper spray at his face. At that point, Mr. Nichols got up from the ground and ran from the officers, one of whom fired a stun gun at him.

About eight minutes later, officers caught up with him again in a residential area near his family's home. After tackling him, they beat him severely, as Mr. Nichols screamed in agony.

A body-worn camera and a surveillance camera captured police officers continuing their assault on Mr. Nichols, with one kicking him so hard in the face that the officer nearly fell down. Throughout the beating, which lasted about three minutes, Mr. Nichols did not appear to ever strike back. Several times, he moved his hands to cover his face, seeming to cower from the officers' blows.

An independent autopsy commissioned by his family found that Mr. Nichols "suffered extensive bleeding caused by a severe beating," according to preliminary findings released this week.

On Friday, Chief Davis said the



By MICHAEL D. SHEAR

## ...ives Has ...eak Spot: ...l It Can Do ...s Say Please

WASHINGTON — The National Archives and Records Administration this week delivered a gentle request to representatives of former presidents and vice presidents: Could you please check again to see if you have any classified documents laying around?

Asking nicely is about all they can do.

Legal experts said that officials at the archives do not have any independent ability to enforce that request, or to require that the country's former leaders conduct searches of the materials they still have in their possession.

Enforcement of the laws governing presidential records and classified documents is up to the Justice Department, which has opened investigations into the actions of President Biden and former President Donald J. Trump, who have each discovered classified records at their homes.

Officials at the department have not commented on whether they plan to open an investigation into former Vice President Mike Pence, who also has acknowledged having a handful of classified documents after he left office.

Officials at the Justice Department declined to comment about enforcement authorities. A spokesperson for the archives declined to comment.

On Thursday, William J. Bosanko, the chief operating officer at the archives, wrote to representatives of the former presidents and vice presidents, urging them to look again in light of the discoveries made by Mr. Biden, Mr. Trump and Mr. Pence.

...quest that you conduct ...t of any materials"



Some members of the House intelligence panel said that they intend to introduce legislation that would impose new sanctions for lax control over classified information.

HAIYUN JIANG/THE NEW YORK TIMES

# In Congress, Shock and Dismay Over Papers' Mishandling

### By CARL HULSE

WASHINGTON — Roy Blunt, a longtime member of the intelligence committees in the Senate and House before retiring this year, said he was always extremely careful and under close supervision when handling classified material.

"I even took off my Fitbit," said Mr. Blunt, a Missouri Republican,

lation that would impose new sanctions for lax control over classified information through carelessness or other behavior that did not rise to the level of criminality. The punishment could include fines, revocation of security clearances and other options. Their effort is not likely to be the only one.

"People are really upset," said Senator Susan Collins, Republican of Maine and a member of the

of Congress take to protect information, several members of the intelligence panels outlined the procedures they operate under. Committee members typically handle or hear classified information in secure rooms in the Capitol.

Upon arriving in an anteroom, they are signed in by staff, directed to lock up all electronics and allowed into the SCIF. Once inside, they are permitted to re-

"I wonder if the executive branch, ironically which is producing these documents, has far looser standards," she added.

When a lawmaker needs to see a document but cannot go to a secure room, it is brought to their office in a locked pouch by an authorized staff member. In the presence of the lawmaker, the pouch is unlocked, the document handed over for review, then returned to

goes back at the appropriate time to the agency that it came from,' said Senator Martin Heinrich, Democrat of New Mexico and an intelligence panel member.

"There's a pretty good system here: You go into the SCIF, and you view information in that location and you don't take it out. So I think we need to make sure we have the same sort of hygiene

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: AIGBEKAEN, RAYMOND IDEMUDIA | | Reg #: 94655-379 |
| Date of Birth: 11/04/1986 | Sex: M   Race: BLACK | Facility: LOR |
| Encounter Date: 05/26/2022 14:00 | Provider: Beppler, Brittany RN | Unit: Z01 |

Nursing - Evaluation encounter performed at Special Housing Unit.

**SUBJECTIVE:**

COMPLAINT **1**      Provider: Beppler, Brittany RN

Chief Complaint: Other Problem

Subjective: Inmate is being assessed after having a use of force against him. Inmate is in ambulatory restraints. C/o right shoulder pain upon palpation. Vitals WNL

Pain: Not Applicable

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 05/26/2022 | 14:00 LOR | 98.8 | 37.1 | Forehead | Beppler, Brittany RN |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 05/26/2022 | 14:00 LOR | 98 | | | Beppler, Brittany RN |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 05/26/2022 | 14:00 LOR | 18 | Beppler, Brittany RN |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 05/26/2022 | 14:00 LOR | 152/81 | Left Arm | Sitting | Adult-regular | Beppler, Brittany RN |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 05/26/2022 | 14:00 LOR | 99 | Room Air | Beppler, Brittany RN |

**Exam:**

**General**

**Affect**

Yes: Cooperative, Flat

**Appearance**

Yes: Appears Well, Alert and Oriented x 3

No: Appears Distressed, Dyspneic, Appears in Pain, Pale, Diaphoretic, Acutely Ill

**Skin**

**General**

Yes: Within Normal Limits, Skin Intact

No: Clammy, Diaphoretic

**Wound**

No: Wounds present

**Head**

Victim of Abuse (Physical)

Exhibit W

# BRAFF, HARRIS & SUKONECK
## COUNSELLORS AT LAW

**Brian C. Harris**
Partner

570 W. MT. PLEASANT AVENUE - SUITE 104
LIVINGSTON, NEW JERSEY 07039-0657
(973) 994-6677
Facsimile (973) 994-1296

New York, New York 10007
(212) 599-2085
Facsimile (212) 822-1479

Writer's
e-mail address
bcharris@bhs-law.com

February 17, 2023

**Via Electronic Filing**
Honorable Christine P. O'Hearn
Mitchell H. Cohen Bldg. & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

    Re: Aigbekaen v. Warden FCI Fort Dix, et al.
    Civ. No. 1:20-cv-08608 (CPO) (SAK)

Dear Judge O'Hearn:

On January 18, 2023 our office was notified that we had been appointed as pro bono counsel in the above-referenced matter to represent Plaintiff, Raymond Aigbekaen, for the limited purpose of responding to Defendant's Motion to Dismiss, as stated in the October 11, 2022 Order, (ECF No. 42).

Our firm is located in Essex County, New Jersey (District Court, Vicinity of Newark, NJ). On or about November 2021 our office reorganized and as a result, we operate as a much smaller law firm. At this time, we are unable to accept this pro bono assignment.

For the reasons expressed above, we respectfully request Your Honor reassign this matter to pro bono counsel located in the vicinity of Camden County.

Respectfully submitted,

BRAFF, HARRIS & SUKONECK

BRIAN C. HARRIS
A Member of the Firm
BCH:gc
cc:    All Counsel (via ECF)
       Raymond Aigbekaen (via regular and certified mail)

UNDUE DELAY
Physical abuse by Staff

1    THE COURT: Well, yeah, but that's a recommendation

2    from the government, that's nothing the Court's done.

3    MR. BALTER: Well, that's true --

4    THE COURT: And there's no (C) plea. I'm making my

5    own independent sentencing decision with respect to

6    Mr. Greene, I can assure you.

7    MR. BALTER: Well, I understand the Court makes a

8    decision with regard to that. To the extent that, as is not

9    unusual, cooperating witness gets the benefit of whatever was

10   negotiated before he undertook his -- before he performed

11   pursuant to the terms of the cooperation, it is not unusual

12   that they get the benefit of what's ever been negotiated.

13   THE COURT: Yeah, well, I don't take (C) pleas as

14   you know, and nothing is confirmed in here in that regard and

15   subject to Mr. Trainer's advocacy, which I'm sure will be

16   superb. To me this thing looks like Greene and Aigbekaen are

17   all relatively equal participants in this deal. And then, you

18   know, Greene will get the benefit of acceptance and Greene

19   will get the benefit of cooperation. But that's for another

20   day. We're not there yet and I'm not prejudging any of that.

21   No adjustment for obstruction. So what's the adjusted offense

22   level, 36?

23   MS. DE ESTRADA: Your Honor, if you are

24   incorporating the grouping rules, you add one point level to

25   the 36, you're at a 37 with an advisory guideline range of 210

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

- DEFENDANT'S CLOSING ARGUMENT -

1    his standpoint had happened.

2            You heard me ask Tanika Thomas, his sister, about it.

3    She was aware of it.

4            You heard me ask her questions directed at the fact

5    that because she was so close to her brother -- and you heard

6    me confront her with her own Facebook posting about how close

7    she was to her brothers and what she would do for them -- how

8    did she consider helping her brother by the way she would

9    testify in this case, she was unable to answer those questions.

10            And it presents these further questions about why

11    Marcell Greene hasn't been a witness in this case to fill out

12    all these missing gaps in the Government's case.

13            And what that adds up to, especially when you have a

14    witness like L., is a big question mark.  And it's a huge

15    question mark when you consider the fact that you good jurors

16    at the end of -- when you deliberate, are going to have to

17    consider whether or not the Government has proven their case

18    beyond a reasonable doubt, but can you rely upon L.'s rendition

19    or the rendition of any of these other witnesses to supply

20    proof beyond a reasonable doubt?

21            So having that big question mark, not knowing what

22    went on two or three days before L. said she ever met Raymond,

23    he didn't have anything to do with this.

24            You also heard her say when Raymond came on the scene,

25    they consciously kept from him what her age was.  They must

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*